UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X
Elevated Parking Solutions, LLC d/b/a
Elevated Storage Solutions, LLC,

                Plaintiff,        Civ. A. No. 1:23-cv-5812

      -vs-                    **JURY TRIAL DEMANDED**

LSC Development, LLC,
                Defendant.
-------------------------------------------------------------------X

## COMPLAINT

Plaintiff Elevated Parking Solutions, LLC d/b/a Elevated Storage Solutions, LLC ("ESS"), as and for its Complaint against Defendant LSC Development, LLC, states as follows:

## NATURE OF THE ACTION

1. This is an action seeking reimbursement for significant damages suffered by ESS due to Defendant LSC Development, LLC's ("LSC") unilateral breach of a joint venture contract for the acquisition and development of a property in Rye, New York.

## THE PARTIES

2. Plaintiff ESS is a Connecticut limited liability company with an address in Greenwich, CT.

3. Defendant LSC Development, LLC is an Illinois limited liability company with an address in Barrington, IL.

## JURISDICTION

4. The Defendant is subject to the personal jurisdiction of this Court pursuant to contract between the parties.

5. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a), because (i) Plaintiff and Defendant are citizens of different states, and (ii) the amount in

controversy exceeds $75,000 exclusive of interest and costs.

6. Venue is proper pursuant to contract between the parties.

## FACTUAL ALLEGATIONS

7. In September 2021, ESS was approached by a real estate group about making an offer to buy a group of properties known as 21, 22 and 23 Nursery Lane in Rye, New York.

8. The sellers of these properties had designed a self-storage facility on the properties and had obtained the required approvals for such a building and commercial operation from the local municipality.

9. Subsequently, ESS entered into a Letter of Intent to purchase the properties in October of 2021 for $5,750,000.00.

10. After a period of negotiations, ESS and the owners of the Nursery Lane properties executed a sales agreement in December of 2021 and ESS paid an Initial Deposit of $287,500.00 as part of the Purchase Price.

11. The Second Deposit of an additional $287,500.00 was due upon the expiration of the Due Diligence Period.

12. ESS began the process of due diligence, and had numerous meetings, phone calls and emails with the City of Rye Zoning officials, building officials, project civil engineer and architect, and reviewed approvals and environmental reports for the project.

13. Prior to and during this time, ESS was actively pursuing private equity and debt funding for the acquisition and development of the above-referenced Nursery Lane project and was successfully obtaining funding with letters of intent.

14. ESS was not actively pursuing a business partner.

15. During early 2022, an investment broker approached ESS with a group that was

interested in investing a significant sum in the Nursery Lane project and future projects.

16. In February 2022, LSC was provided with an outline of what a number of private equity groups were offering ESS to proceed with the development.

17. As ESS considered this opportunity, ESS was then introduced to LSC in February 2022 by Newmark Midwest Region, LLC as an alternative to the investment group.

18. ESS and LSC began corresponding about creating a joint venture.

19. ESS was in the process of obtaining an ALTA survey in early February 2022 when negotiations began with LSC on the development of the property.

20. LSC specifically stated numerous times that its people would be the ones handling any testing and reports for the Nursery Lane properties.

21. By March 1, 2022, LSC presented a proposed joint venture structure that was signed by Mr. Chris Barry of LSC.

22. This proposed joint venture structure provided a 10-year initial term, with subsequent renewals, and placed 100% of the equity contribution on LSC.

23. In addition, under the terms offered to ESS in early March, ESS was to share in both the development and construction management fees for the Nursery Lane project, as well as subsequent projects.

24. At this point, ESS decided to partner with LSC.

25. While the promise of future projects was exciting, the Nursery Lane project remained a priority for ESS, and LSC agreed to fund the Second Deposit and arrange financing for its acquisition and development.

26. As a result of the impending partnership with LSC, which would include LSC's financing of the Nursery Lane properties, ESS' contacts with all lenders and equity groups ceased.

27. LSC suggested offering and funding $100,000 to the sellers to extend the closing date, which the sellers agreed to.

28. On the eve that the Second Deposit was due, LSC and ESS came to terms and executed an Operating Agreement dated March 18, 2022, regarding the terms of the joint venture.

29. At the time, LSC knew what had and had not been done with respect to the project.

30. After the execution of the Operating Agreement between ESS and LSC, LSC paid the Second Deposit and said it were prepared to make the payment to extend the Closing Date.

31. This payment was due on Wednesday, April 6, 2022.

32. On the afternoon of April 5th, Mr. Paul Bergin from LSC met with ESS at the Nursery Lane site.

33. During that meeting, Mr. Bergin stated to ESS that LSC wanted to cancel the contract that ESS had with its architect for the project, a contract that ESS had shared with LSC weeks before the meeting at Nursery Lane.

34. Mr. Bergin went on to state that LSC believed that any contract can be canceled and that LSC "does that all the time."

35. That was an ominous statement.

36. On April 5th at approximately 6pm EST, Mr. Barry told ESS that the $100,000.00 for the closing extension would be wired immediately.

37. Around 8pm EST on April 5th, Mr. Barry called Mr. Nick Barile of ESS while he was at his home to inform ESS that LSC had decided not to close on the Nursery Lane properties.

38. During this phone call conveying the shocking breach of contract, Mr. Barry also

told Mr. Barile that LSC wanted to continue to work with ESS and that future projects would be forthcoming.

39. Mr. Barry specifically stated that the Initial Deposit lost by ESS would be reimbursed to ESS as an equity credit on future projects with LSC and that LSC would take full responsibility for the abrupt cancellation of the Nursery Lane project.

40. Additionally, Mr. Barry assured ESS that LSC would financially contribute to the further development of a prototype system that ESS had been paying for and building.

41. The current development status of the prototype was well known to LSC at the time they breached the contract.

42. Without LSC, ESS did not have the funds to close, as ESS had ceased communication with all other equity groups and lenders in reliance on LSC's commitments, and therefore on April 6, 2022, ESS had to inform the Nursery Lane Sellers that LSC and ESS would not be proceeding to Closing and were forfeiting the Initial Deposit and the Second Deposit.

43. Over the next several days, ESS re-sent LSC information that it had previously provided to LSC on the automated self-storage system, including the intellectual property rights and the prototype specifications.

44. On May 3, 2022, ESS sent LSC a progress picture of the prototype and asked when LSC could begin participating in funding of the prototype.

45. ESS received no reply to this correspondence.

46. Again, on May 12, 2022, ESS asked LSC to begin participating in the prototype costs.

47. That same day, ESS provided Mr. Barry an update of the progress of the construction of the prototype.

48. Understandably, ESS was extremely concerned with LSC's sporadic

communication and obvious culture of canceling and breaching contracts.

49. ESS continued to contact LSC throughout the late spring of 2022.

50. LSC's lack of responsiveness, however, convinced ESS that LSC was not sincere about partnering with ESS on the development of automated self-storage facilities or contributing to the construction of the prototype.

51. On October 14, 2022, ESS reached out to LSC asking LSC to reimburse ESS for the loss of the Initial Deposit for the Nursery Lane project that ESS had paid.

52. LSC refused.

53. LSC also did not move forward on any business with ESS.

54. ESS suffered significant damages due to LSC's abrupt breach of contract and withdrawal from the Nursery Lane project

55. These damages were foreseeable to LSC at the time that it breached.

56. As a result of LSC's actions, ESS lost and continues to lose, at a minimum:

(1) the Initial Deposit of $287,500.00;

(2) accruing interest on the Initial Deposit;

(3) contractual profit and overhead on the automated system at the Nursery Lane properties and future projects;

(4) contractual development fees at the Nursery Lane properties and future projects;

(5) contractual project management fees at the Nursery Lane properties and future projects;

(6) anticipated profit on the facility at the Nursery Lane properties and other future projects;

(7) loss of time, resources and opportunities while negotiating and working with LSC;

(8) damage to ESS' reputation in the self-storage and real estate communities as a buyer; and

(9) damage to ESS' reputation in the self-storage community with regard to the technology of the automated self-storage units.

## FIRST CAUSE OF ACTION
## (BREACH OF CONTRACT)

57. Plaintiff repeats and re-alleges the allegations of each of the foregoing paragraphs.

58. Plaintiff and Defendant entered into a written contract whereby Defendant agreed to fund the purchase and development of the Nursery Lane project.

59. However, Defendant failed in its obligations, and unilaterally cancelled and breached the contract without any right to do so.

60. Defendant also promised to co-venture and fund additional projects for Plaintiff.

61. Defendant failed to do this either.

62. A valid and binding agreement existed between Plaintiff and Defendant.

63. Plaintiff stood ready, willing, and able to perform its part of the agreement.

64. Defendant, however, failed to keep its commitments under the agreement, and cost Plaintiff the Nursery Lane project.

65. Defendant thereby materially breached the agreement with Plaintiff.

66. As a result of Defendant's breach, Plaintiff has been damaged, at a minimum: for

(1) the Initial Deposit of $287,500.00;

(2) accruing interest on the Initial Deposit;

(3) contractual profit and overhead on the automated system at the Nursery Lane properties and future projects in the minimum amount of $300,000;

(4) contractual development fees at the Nursery Lane properties and future projects in the

minimum amount of $200,000;

(5) contractual project management fees at the Nursery Lane properties and future projects in the minimum amount of $52,000;

(6) anticipated profit on the facility at the Nursery Lane properties and other future projects in the minimum amount of $3,000,000;

(7) loss of time and resources while negotiating and working with LSC in the minimum amount of $180,000;

(8) damage to ESS' reputation in the self-storage and real estate communities as a buyer; and

(9) damage to ESS' reputation in the self-storage community with regard to the technology of the automated self-storage units.

67. Accordingly, Plaintiff respectfully requests that the Court award to Plaintiff its compensatory and consequential damages, together with pre-judgment interest, in an amount to be determined at trial but no less than $4 million dollars.

## SECOND CAUSE OF ACTION
### (FRAUDULENT INDUCEMENT)

68. Plaintiff repeats and re-alleges the allegations of each of the foregoing paragraphs.

69. Defendant approached Plaintiff to become involved in the Nursery Lane project and to co-venture with Plaintiff.

70. Defendant knew that Plaintiff was pursuing other sources of funding at the time, and that time was of the essence for Plaintiff to secure funding.

71. Defendant knew that if it didn't promise to fund the acquisition and development of the Nursery Lane project, Plaintiff would go elsewhere.

72. Accordingly, Defendant agreed to fund the acquisition and development of the Nursey Lane project.

73. However, Defendant apparently had no intention of going through with its promises.

74. Defendant apparently believed that "all contracts can be cancelled" and did so all the time.

75. Accordingly, Defendant knew at the time that it entered into the agreement that it had no intention of honoring it.

76. Defendant thereby purposefully induced Plaintiff to enter into the agreement knowing that its terms would not be honored.

77. Defendant made such material, false representation/omission in order to induce Plaintiff to enter into the transaction.

78. Plaintiff justifiably relied on Defendant's misrepresentations and omissions.

79. Defendant's fraud thereby directly and proximately damaged Plaintiff in an amount to be proven at trial.

80. Likewise, Defendant knew at the time it promised Plaintiff that the Initial Deposit lost by ESS would be reimbursed to ESS as an equity credit on future projects with LSC that it had no intention of any future projects.

81. Defendant purposefully made this material, false statement to induce Plaintiff not to take any action with regard to the Nursery Lane project, knowing that the Nursery Lane project was small compared to the parties' anticipated future projects.

82. Plaintiff justifiably relied on Defendant's misrepresentation.

83. This in turn led to the direct and proximate loss of the Nursery Lane project, as well as an absence of any future projects.

84. Defendant's actions were deliberate, with knowledge of Plaintiff's rights, and with intent to interfere with those rights.

85. Defendant's actions were wanton, willful, and malicious.

86. Accordingly, punitive damages should therefore be awarded against Defendant's in addition to compensatory damages, in an amount no less than three times Plaintiff's compensatory damages.

87. Additionally, attorney's fees should be awarded against Defendant and in favor of Plaintiff.

## THIRD CAUSE OF ACTION
## (BREACH OF FIDUCIARY DUTY)

88. Plaintiff repeats and re-alleges the allegations of each of the foregoing paragraphs.

89. As a co-venturer, Defendant owed Plaintiff full fiduciary duties.

90. Accordingly, Defendant was prohibited from taking any action that would inure to the detriment of Plaintiff.

91. Defendant knew that its actions would cause substantial harm to Plaintiff, but Defendant proceeded in harming Plaintiff anyway.

92. Defendant premised its harm to Plaintiff on the promise of future compensation and remuneration, but this too proved to be just another of Defendant's lies.

93. Defendant's unilateral actions and refusal to abide by the terms of the parties' partnership breached Defendant's fiduciary duties to Plaintiff.

94. Such breach was a substantial factor in costing Plaintiff the damages enumerated above, as well as the need to hire an attorney to pursue this matter in Court due to Defendant's refusal to reimburse Plaintiff for its losses.

95. Defendant's actions were deliberate, with knowledge of Plaintiff's rights, and with intent to interfere with those rights.

96. Defendant's actions were wanton, willful, and malicious.

97. Accordingly, punitive damages should therefore be awarded against Defendant's in addition to compensatory damages, in an amount no less than three times Plaintiff's compensatory damages.

98. Additionally, attorney's fees should be awarded against Defendant and in favor of Plaintiff.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands that a judgment be entered against Defendant in an amount to be proven at trial but believed to be no less than $4,000,000 on its first cause of action, and an amount to be determined at trial on its second and third causes of action, together with punitive damages, pre- and post-judgment interest thereon at the statutory rate; attorneys' fees, the costs and disbursements of the within action, and such other, further and different relief which this Court deems just and proper.

Dated:  Fresh Meadows, New York
          July 1, 2023

    /s/ Jonathan E. Neuman
JONATHAN E. NEUMAN, ESQ.
*Attorney for Plaintiff*
176-25 Union Turnpike, Suite 230
Fresh Meadows, New York 11366
(347) 450-6710
(718) 228-3689 *facsimile*
jnesq@jenesqlaw.com